CORRUGATED FIBER CO. v. PAPER WORKING MACHINES CO. et al.

(District Court, E. D. New York. July 19, 1919.)

1. PATENTS ⬥227—INFRINGEMENT—WHAT CONSTITUTES.

If a machine be capable of such adjustment that it will infringe an earlier patent, and if that adjustment be something which would be advantageous and within the manipulation of an ordinary workman in setting up and operating the machine, the machine is an infringement, irrespective of intention not to infringe.

2. PATENTS ⬥226—INFRINGEMENT—INJUNCTION.

Where a machine is capable of infringing a patent, an injunction restraining the infringement will issue, although it had not been previously used so as to cause injury.

3. PATENTS ⬥328—INFRINGEMENT—WHAT CONSTITUTES.

The Langston patent, No. 1,179,941, claims 6, 16, and 17, for a machine for making double-faced corrugated paper, including means for applying a second facing sheet to a corrugated sheet which has a facing sheet upon the opposite surface, held infringed as to the two latter claims, but not as to claim 6, by machines constructed as a modification of the machine described in the Raffel patent, No. 1,189,737, and designed for making corrugated paper.

In Equity. Suit by the Corrugated Fiber Company against the Paper Working Machines Company and another. Decree for complainant.

Sexton, Jeffery, Kimball & Eggleston, of New York City (R. D. Eggleston, of New York City, of counsel), for plaintiff.

Briesen & Schrenk, of New York City (Hans v. Briesen and F. A. Klein, both of New York City, of counsel), for defendants.

CHATFIELD, District Judge. Suit is brought upon claims 6, 16, and 17 of patent No. 1,179,941, granted April 18, 1916, to Samuel M. Langston, on an application filed September 13, 1915. The invention relates to an improvement in a machine "for making double-faced corrugated paper, and more particularly to the means for applying the second facing sheet to a corrugated sheet which already has a facing sheet upon the opposite surface."

The art, which is of comparatively recent development, has to do with the making of paper board with a smooth outer surface on each side, and with a center composed of a corrugated sheet, thus forming a sub-

stitute for board in the making of cartons or boxes and for protective material in the packing of fragile articles.

The present suit is brought against a company which has recently developed a considerable business in the manufacture of paper working machines, and of which company the defendant Tobias E. Raffel is the president. Mr. Raffel himself patented a machine for applying a web of plain paper to a corrugated sheet which has been previously faced on one side with plain paper, which patent, No. 1,050,292, was issued on January 14, 1913, on an application filed February 2, 1912.

The plaintiff in the present action brought a suit against the defendant company in the southern district of New York, charging infringement of another Langston patent, No. 878,403, dated February 4, 1908, application filed June 27, 1907, which resulted in a decree in favor of the plaintiff. Corrugated Paper Patent Co. v. Paper Working M. Co. (D. C.) 237 Fed. 380.

The issuance of this decree compelled the defendant to change the structure which it had been using, and which disclosed a series of slats in the form of a belt rolling by means of sprocket wheels around two axes in such a way as to let their weight rest upon the surface of the plain paper after it had been brought in contact with the corrugated paper, with an adhesive mixture applied to the under surface of the plain paper, so as to make it adhere to the crowns of the corrugations.

The defendant Raffel thereupon devised a structure, which he patented in No. 1,189,737, July 4, 1916, application filed March 14, 1916, in which a number of slats are loosely mounted upon pins attached to strips of angle iron, which are oscillated to and fro and can be raised by a lever connected to these angle irons, by pivoted arms. The purpose of mounting each slat freely upon a pin at each end was to allow the weight of that slat alone to rest upon the moving web, which is always drawn forward under the pressing device, but at a different speed than that of the slats, thus giving an ironing effect to the action of each slat. If any inequality is met with or obstruction occurs, it will be smoothed down, blisters will be eradicated, and the paper made to adhere smoothly, unless the obstruction be of sufficient size and hardness to lift the weight of the particular slat. At the same time by turning the lever, the entire structure can be raised to permit of threading a new portion of web into the feeding rolls when necessary, and also in order that the pressing device can be lifted if the machine has to be stopped, so as to free the paper from the lower surface or table, which is heated for the purpose of drying the adhesive.

Subsequently to the decision set forth in 237 Fed. 380, supra, the Court of Appeals in the 8th Circuit, in Peter Heibel & Sons P. M. & M. Co. v. Corrugated P. P. Co., 247 Fed. 332, 159 C. C. A. 426, held that the claims of the Langston patent, 878,403, were invalid, and dismissed the bill. The defendant thereupon obtained a temporary stay of the injunction in the Southern district of New York, pending appeal to the Court of Appeals in this circuit, and has returned to the former style of manufacture.

Raffel also obtained from the Patent Office patent No. 1,146,771, under date of July 13, 1915, on an application filed June 26, 1914, in

which he has set forth the device which was held to be an infringement in the case in the Southern district, and has combined this device with a machine for applying the first surface of plain paper with adhesive to the corrugated sheet.

It appears from the testimony that the structure described in patent No. 1,189,737, in which the pressing device could be lifted by the movement of a lever, was too heavy and awkward for manipulation by the employés who were put at work upon such machines, and could not be held at intermediate positions at any particular height desired. The defendant then constructed a modification in which the angle irons, with their set of iron slats, were suspended by two bell-crank levers on each side from bars which were attached to arms turned by a large gear wheel movable by means of a small pinion with a ratchet and hand lever. By moving the lever the small gear wheel would turn the larger gear, and thus rotate the arms, so as to lift the plates to any desired position of pressure, or to lift the presser device entirely, when this was desired. As planned, the presser device was so constructed as to rest freely upon the surface of the paper. The slats of the presser device were reciprocated slightly forward and back by means of a pitman arm and cam, running in an eccentric cam slot in the side face of a driving wheel of the machine. The reciprocating movement of the slats thus gave an ironing effect like the strokes of a flatiron, in addition to that produced by the drawing of the paper, together with the corrugated web, through the rollers of the machine, under the slats resting on the paper surface.

In practice it appears that the machine could be so adjusted, particularly by changing the position of the set screws or by the insertion of a pin in the teeth of the large gear wheel, that the slats, instead of resting freely upon the paper, would be lifted slightly at each end of their stroke, or at one end of the stroke, as the case might be, and in this way the effect was produced which is given by putting down a flatiron upon the surface to be ironed, giving it a slight pressure, and then raising the iron again before it is entirely removed from contact.

It also appears that a few machines of this type were placed upon the market, some of which were exported to foreign countries. No positive evidence of the exact sale of these machines has been produced; but the defendant has in no way disclaimed, and in fact has substantially admitted, similarity of design with the machine actually described in the testimony. The defendant disavows either intent or knowledge with respect to the use of a pin or other device for adjustment to lift the weight of the pressing structure at will as a part of each forward stroke of the eccentric connecting rod. It insists that the purpose of the device for lifting the pressing structure was solely to raise the slats as a whole, when the machine might be stopped, or when it was necessary to thread the machine.

The plaintiff points out an apparently mechanical impossibility in the defendant's structure as planned by the defendant, in that the presser device rests for the entire length of the angle iron upon an unlubricated iron rail on each side. The angle irons are reciprocated some

40 times a minute, and must gradually develop friction and heat, which would apparently inevitably interfere with the operation of the machine, unless lubrication were adopted.

Raffel, the president of the defendant, denies the probability as well as the fact of the need of lubrication, while the plaintiff contends that evidently the defendant's machines were operated as shown in the testimony; that is, with such adjustment as to lift the weight of the presser device from the paper during the greater part of each stroke.

As has been stated, the prior art is not extensive. Most of the patents make use of some surface or table to which heat can be applied and over which the paper is to be passed. All of the machines are based upon the fundamental idea of attaching a sheet of paper by adhesive to each side of a third sheet of paper, which has been rolled into corrugated form.

The earliest patent, to Thompson, No. 252,547, dated January 17, 1882, application filed October 24, 1881, provided for mechanism to properly feed paper and corrugate the same, covering the sheet of paper and applying adhesive. Heat was supplied through the corrugating rolls, and a brush smoothed down the surface paper upon the corrugations.

The Ferres patent, No. 545,354, dated August 27, 1895, application filed February 21, 1895, brought in slats, fastened to rods so as to make a belt of barrel hoops rotating like a sprocket chain around axes so placed as to form a flat under surface over which to pass the composite web of corrugated paper and two sheets of plain paper. Another belt of slats was located above this paper in such a way that the lower portion sagged down of its own weight upon the composite material in order to furnish a more or less yielding and flexible, but pressing and smoothing, surface. He also caused the circulation of air currents from one side to the other, in order to dry the adhesive easily and quickly.

In the Chapin patent, No. 618,376, dated January 24, 1899, application filed December 9, 1897, the idea was shown of placing a facing paper upon both sides of the corrugated sheet, in order to make a cellular board smooth on both sides, and more stiff and rigid than the material previously manufactured. This machine drew the composite board forward by intermittent feed, and applied two steam boxes or heaters, one above and the other below the paper surface. The upper of these heaters could be raised for each forward feeding movement by the operation of a rock shaft. Chapin specifies that the heating plates may be made in sections, apparently for convenience in assembling and repairing, and he specifies that there is an advantage in having the feed intermittent, so as to apply the heat and pressure when the board is stationary. The distance between his heaters is such as not to crush the corrugations but to press the board down firmly for the purpose of causing it to adhere.

Another Ferres patent, No. 746,807, dated December 15, 1903, application filed March 15, 1899, uses the slat rollers in a form generally similar to that of his previous patent; but he draws the composite board between a series of plates heated by steam pipes and fixed in

position so as to give the desired space between the plates. As in Chapin, he makes these steam plates in sections, for convenience mechanically.

Much argument has been made by the defendant to show that Ferres contemplated a flexible connection between the plates. But there is nothing in the Ferres patent to indicate that Ferres had any idea of relieving the pressure upon the composite board by allowing one section to be lifted independently of the others.

The next patent, to Hahn, No. 782,558, dated February 14, 1905, application filed June 16, 1904, sought to improve over the previous devices by passing the combined web through a series of rollers which were inclosed in a heated chamber, and which served as the actuating device for moving the paper along, as well as to press the parts together and cause them to adhere firmly while flattening out any blisters or inequalities. Hahn soon found that his idea was not satisfactory, as the surface of the board sprung between the several rollers, and these inequalities crowded down upon the last rollers, where the work was not done effectually. He therefore placed between each set of rollers a series of flat presser blocks, with the idea that the rollers would drag the paper along, and that the presser blocks would flatten and hold together the facing paper and the corrugated strip. He rotated the rollers by a series of worm gears driven by a continuous shaft at the side, and it is quite apparent from Hahn's specifications and drawings that his structure was rigid, rather than yielding, in the sense which we have under consideration in this connection.

The Clarke patent, No. 1,095,140, dated April 28, 1914, application filed March 4, 1911, has a series of hollow or box-shaped members, providing a substantially continuous surface for heating and supporting the composite web. Another hollow box is supported at the proper distance above by links pivoted to the side rails and so arranged as to be held by a notch and pin in a position giving the required height. Clarke uses a series of idler rollers to insure continued contact between the parts of the composite web and to prevent buckling or bending of this web when being pushed or pulled forward by the reciprocating movement of the pressing and heating boxes.

In the meantime the Langston patent No. 878,403, dated February 4, 1908, application filed June 27, 1907, had been granted, in which the rotation of a heavy belt which is allowed to sag down upon the upper surface of the composite web, holds this against the surface of a heating table, while the paper is pulled forward over this heated surface. Thus some ironing effect is obtained and the parts are kept in contact while adhering.

Langston's next patent was the patent in suit, No. 1,179,941, April 18, 1916, and the claims with which we have to do are as follows:

"6. A machine of the class described, including a support for the material, a superposed pressure plate, a pair of parallel links controlling the movement of said pressure plate, and means for varying the effective pressure exerted by the latter."

"16. A machine for making double-faced corrugated paper, including means for applying adhesive to the crowns of the corrugations of a single-faced corrugated sheet, means for delivering a facing sheet to the adhesive covered crown, a support over which the combined sheet passes and engaging with

said facing sheet, a plurality of independent pressure plates arranged in succession and adapted to rest upon the combined sheet as the latter passes over said support, and guiding means for each plate permitting of the independent movement of said plates upwardly as irregularities in the thickness of the combined sheet pass therebeneath.

"17. A machine for making double-faced corrugated paper, including means for applying adhesive to the crowns of the corrugations of a single-faced corrugated sheet, means for delivering a facing sheet to the adhesive covered crowns, a support over which the combined sheet passes and engaging with said facing sheet, a plurality of independent pressure plates arranged in succession and adapted to rest upon the combined sheet as the latter passes over said support, guiding means for each plate permitting of the independent movement of said plates upwardly as irregularities in the thickness of the combined sheet pass therebeneath, and means for simultaneously raising all of said plates out of engagement with said combined sheet."

Raffel in his earliest application (1912) employed the barrel slat belt of the Ferres patent, and also moved this barrel at a slower rate of speed than that at which the web traveled to obtain the ironing effect desired. The patent in suit was for the purpose of affixing the second surface sheet to a corrugated web, to which one surface sheet had been already attached.

In his next patent, No. 1,146,771, dated July 13, 1915, Raffel again uses the barrel-like idea for the purpose of affixing both surfacing sheets of paper to a corrugated sheet in one machine, using a stationary heater for the application of each surface paper, but reversing the direction of the corrugated paper after one surface paper had been applied, in order to bring the corrugated strip over the second heating table. He draws the paper through the entire structure by rollers, independent of the movement of the ironing slats, which, as has been said, move at a different speed.

In his third patent, No. 1,189,737, dated July 4, 1916, application filed March 14, 1916, he brings in the idea which is described in the device alleged to be an infringement of the Langston patent, viz., the series of slats, each capable of being raised by itself on the vertical pins, and with the whole structure capable of being lifted from the surface of the paper by the use of a lever in the same way in which Clarke lifted his heating chambers through suspension by pivoted links.

Sufficient discussion has been had to show that the Langston patent is apparently valid in the idea which it seeks to protect by the claims in question. The real issue is whether these claims, when construed in a valid way, are broad enough to cover the device which is alleged to infringe.

[1] It is no defense for the defendant to say that his structure was not intended to be so adjusted or to be so used as to infringe. If the machine be capable of such adjustment that it would infringe an earlier patent, and if that adjustment be something which would be advantageous and within the manipulation of the ordinary workman in setting up and operating the machine, the machine would certainly be an infringement. Sanitary Street Fl. M. Co. v. City of Amsterdam (D. C.) 225 Fed. 389.

[2] An infringing device might be absolutely harmless for a different purpose, as, for instance, a small metallic structure might be used

as a paper weight and thus be no infringement of an operative device for some mechanical purpose, but if complete and ready for use, in the way in which use was intended, it would be the object of injunction, even though no damages had resulted from this use as a paperweight. Parsons Non-Skid Co. v. Atlas Chain Co., 198 Fed. 399, 117 C. C. A. 286.

[3] In the case at bar, if a workman using the structure, in order to avoid friction and to improve the product, by making the weight upon the paper less, arranges the parts by close adjustment, so that a part of the weight is continuously carried by the supporting structure, and if the machine as manufactured allows such an adjustment, then the machine does not operate solely in the manner specified by the defendant and would be an infringing device, if the changes causing this infringement were purely mechanical, or those simply which would occur to any operator who was seeking delicacy of adjustment and simplicity of operation.

To make the matter specific, it would seem that if the angle irons of the Raffel patent bore upon the supporting side plates in such a way as to cause friction, or if the presser plates, when allowed to fall with their full weight, exerted too much pressure upon the paper, and if an adjustment was possible by which the angle irons could not rest freely upon, or at all times reach, the supporting surface, or if the method of adjustment was such that the angle irons supporting the slats could be held partially suspended and the machine operated, then the machine would be an infringement, even though the defendant had never intended it to be operated in any other way than with the plates fully lowered, so as to rest in frictional contact upon the side members, and even though he considered such a machine operative without adjustment.

The defendant contends that its machine could not be so adjusted as to produce the effect found in the operation of the machine by a workman who had placed a cotter pin between the teeth of the gear of the raising mechanism. But it is apparent that the machine could be so set as to raise the presser mechanism the distance caused by the movement of one tooth of the gear, as well as at the height produced by a movement past several teeth of the gear, which would be the method of raising the plate entirely, so as to thread the machine, or while the machine was stopped. If the position of the plate produced by moving one tooth of the gear was too high, and if the position produced by freeing the supports entirely was too low, and if the machine could be fixed in another intermediate position, we would have the structure which it is alleged infringes the Langston patent.

The workman in question obtained this intermediate position by inserting the cotter pin. The testimony would indicate that some such intermediate position, or some relief from the effect of allowing the full weight of the presser parts to bear upon the paper, would be necessary. Not only would the friction caused by the free use of the freely released weight of the parts make the success of the machine doubtful, but the unrestricted movement forward and back of the ironing plates, by means of the eccentric rod, would make it destructive of

the surface of the paper when a harder obstruction was met, unless the slats were always so light in weight as to be capable of reciprocation back and forth over such obstructions. On the other hand, the application of these slats, like the application of a flatiron, with an increasing and then decreasing pressure, seems much more practical and productive of better results.

The number of these machines put in use was so small, and the testimony is so uncertain as to the possible use of the machine in any way, except where some adjustment like that of the cotter pin was found necessary, even though in disregard of the purpose and idea of the defendant's design, that the defendant's machine should be held as infringing—that is, as capable of infringement, and as infringing, if operated in such a way as to be satisfactorily used—unless the claims of the Langston patent are not broad enough to make such infringement actionable.

Claim 6 says, "A machine of the class described." This class is not only that of machines for making double-faced corrugated paper, but a machine of the general sort set forth in the Langston specifications, with parallel links controlling the movement of the presser plate as shown in the Clarke patent. The words "means for varying the effective pressure" must be taken in the Langston patent to refer to means for varying that pressure in one of the two ways described in claims 5 and 6. They do not cover the old idea of using heavier slats when desirable.

In claim 5 Langston describes a series of presser plates of which any one can be moved upwardly toward the delivery end of the machine. In claim 6 Langston describes a particular means for making the weight of any single presser plate greater than that of the weight of the presser plate before it, or after it, and he also describes the same idea as in claim 5; that is, of having each plate so movable that its effective pressure can be varied if an obstruction be met sufficient to raise the weight of the plate.

But Langston has not covered in this claim the idea of putting down a presser plate so as to increase the pressure at the lower part of its stroke, and then to raise this presser plate so as to diminish the pressure at the latter part of the stroke; in fact, the amount of weight at each plate, at all parts of the Langston stroke, would be substantially the same. He has merely the idea of a number of presser plates, each of which will be much lighter than the combined structure will be. He has thus improved over the prior art, and has a more flexible structure; but he has not used the reciprocating or forward and back ironing stroke of the Raffel patent, nor has he covered the constantly changing pressure that would result by forcibly rocking the bell crank hangers with the presser plates in mechanical suspension from those hangers, instead of being allowed to float freely upon the surface of the paper.

Langston shows the possibility of lifting each plate as a whole, the same as in Clarke, while the so-called infringing device, as operated by the workman who inserted the cotter pin, was not limited to this lifting device of Clarke for the purpose of allowing each plate to

fly up if an obstruction were encountered. That result was accomplished by the use of the vertical pins on the angle iron side bars. Nor did this workman make use of the idea of varying the pressure by changing the position of the counterweight, as claimed by Langston. This counterweight was no more than a particular method of regulating the load, which was old in the art and was shown by Hahn when he increased the weight of each roller, as occasion might require.

The defendant's structure and the form created by the use of the cotter pin was thus of itself an improvement over the prior art. But the improvement does not seem to have been covered by Langston and the machine does not infringe claim 6, when that is construed with the specifications and drawings, and is not taken in the broad sense or all possible meanings of the words of the claim.

Claim 16 has to do with the independent motion of each presser plate or presser unit, and claim 17 adds the idea of moving all of these units at the same time when necessary. Claim 17 also adds the idea of the Clarke patent, and makes it applicable to the structure shown by claim 16 of the Langston patent. There is no reason to suppose that either of these claims is invalid. They are both clear improvements over the prior art, and no earlier patent has shown any appreciation of this idea of lessening weight by having more than one separately movable presser plate, which is free to lift vertically by itself while all may be entirely lifted off or adjusted as a unitary structure.

Clarke shows the idea of having separate units or separate presser devices, but he did not combine them together in continuous motion in one direction, nor make them capable of such operation as is shown by Langston. The defendant's device has, however, separate units, which are allowed to rise up and down upon pins which are mechanically the equivalents of the bell crank hanger of the Langston structure.

Claims 16 and 17 are not limited to a machine "of the class described" and also describe the entire machine. They vary from the sprocket wheel arrangement of the Ferres and earlier Raffel patents, in that each slat is able to move upward independently, and the defendant should not be allowed to escape infringement by showing that he has substituted a pin freely working in a hole in the slat for an oscillating bell crank lever. His reciprocating slats may be an improvement. His use of the bell crank suspension, so as to obtain the increasing and decreasing pressure of the iron with each movement, would appear to be patentable invention. But he predicates these upon the use of a slat which can rise as a separate pressure element when an obstruction is met. This idea is the basis of the use of a pin in the defendant's machine, and is clearly shown in the movable presser plate of Langston with its vertical component of motion in each separate presser part. Thus the defendant's device infringes claim 16 and 17 of the Langston patent and does not infringe claim 6.

Let decree be entered accordingly.